## COMMONWEALTH vs. STANLEY FILOMA.

No. 09-P-1396.

Suffolk. September 15, 2010. - March 9, 2011.

Present: DUFFLY, SIKORA, & MILKEY, JJ.[1]

*Evidence,* Intoxication, Blood alcohol test, Breathalyzer test. *Intoxication. Motor Vehicle,* Homicide, Operating under the influence. *Homicide. Assault and Battery by Means of a Dangerous Weapon. Practice, Criminal,* Assistance of counsel, Instructions to jury.

At a criminal trial, the Commonwealth's failure to submit proper proof of the element of operating under the influence of intoxicating liquor required reversal of the defendant's convictions of two counts charging operation of a motor vehicle under the influence of intoxicating liquor and causing serious bodily harm, in violation of G. L. c. 90, § 24L(2). [20-22] MILKEY, J., concurring.

At a criminal trial, the Commonwealth's failure to submit proper proof of the element of operating under the influence of intoxicating liquor, although requiring reversal of the defendant's convictions of two counts charging operation of a motor vehicle under the influence of intoxicating liquor and causing serious bodily harm, in violation of G. L. c. 90, § 24L(2), did not undermine the separate verdicts of guilt of involuntary manslaughter and of aggravated assault and battery by means of a dangerous weapon (an automobile), given that the judge instructed the jury precisely and accurately on the elements of those offenses, which did not include any element relating to impairment by alcohol, and given the quantity and quality of evidence supporting those offenses. [22-23]

There was no merit to a criminal defendant's claim that his trial counsel rendered ineffective assistance by failing to request a jury instruction on the defense of accident, where the evidence at trial failed to support any reasonable possibility of accident. [23-24]

INDICTMENTS found and returned in the Superior Court Department on April 1, 2004.

The cases were tried before *Elizabeth B. Donovan,* J.

*Kevin S. Nixon* for the defendant.

[1]Justice Duffly participated in the deliberation on this case while an Associate Justice of this court, prior to her appointment as an Associate Justice of the Supreme Judicial Court.

*Zachary Hillman,* Assistant District Attorney, for the Commonwealth.

SIKORA, J. A Superior Court jury found the defendant, Stanley Filoma, guilty of involuntary manslaughter, G. L. c. 265, § 13; two counts of aggravated assault and battery by means of a dangerous weapon, an automobile, G. L. c. 265, § 15A(*c*)(i); and two counts of operating a motor vehicle under the influence of intoxicating liquor and causing serious bodily injury, G. L. c. 90, § 24L(2) (alcohol-related offenses).[2]

On appeal, the defendant argues that the Commonwealth failed to submit proper proof of impairment as an element essential for the two convictions of operating under the influence and causing serious bodily injury. He contends further that the jury's resulting finding of operating under the influence infected its separate findings of guilt of involuntary manslaughter and of aggravated assault and battery by means of a dangerous weapon. He complains finally that his trial counsel performed ineffectively because he did not request an instruction to the jury upon the defense of accident. For the following reasons, we reverse the judgments on the charges of operating under the influence of intoxicating liquor and causing serious bodily injury, and affirm the judgments on the charges of involuntary manslaughter and aggravated assault and battery by means of a dangerous weapon.

*Factual background.* The evidence permitted the jury to find the following facts. On February 1, 2004, the defendant watched a broadcast of the Super Bowl football game with some friends and family members at a relative's home in Canton. During the

---

[2] The alcohol-related offenses were for the lesser included offenses of the counts charging violations of G. L. c. 90, § 24L(1) (operating a motor vehicle recklessly or negligently while under the influence of intoxicating liquor and causing serious bodily injury).

The events described below generated a fourteen-count indictment addressing the death of one person and the injuries to four others struck by a motor vehicle driven by the defendant. Our opinion addresses only those counts resulting in convictions and in the present appeal.

The judge sentenced the defendant to a period of six to eight years in State prison upon the conviction of involuntary manslaughter; to concurrent sentences of four to six years in State prison upon each of the convictions of aggravated assault and battery by means of a dangerous weapon (an automobile); and to subsequent, concurrent periods of probation upon the convictions of operating under the influence of intoxicating liquor and causing serious bodily injury.

course of the game he consumed four to six beers.[3] After the game he drove his sport utility vehicle (SUV) to the Fenway area of Boston. He had previously lived in that neighborhood for approximately thirteen years. Then by telephone he made arrangements to return keys to the apartment of his former girlfriend, a resident of a building on Symphony Road in the Fenway area.

When he arrived in that neighborhood after 11 P.M., crowds of young people from the surrounding student housing population had poured into the streets ostensibly to celebrate the Super Bowl victory of the New England Patriots. The crowds congested the narrow streets in the area, including Hemenway Street, Symphony Road, and St. Stephen Street. Elements of the crowds became riotous; they lit small fires, damaged parked cars, and overturned others.

Formations of riot police moved down Hemenway Street and across its intersection with Symphony Road in efforts to break up mob clusters and to clear the streets. On Symphony Road, the police encountered several overturned cars, one in the middle of the road and two or more along its sides.

Amid this scene, the defendant attempted to reach the apartment of his former girlfriend by backing down Symphony Road against its one-way direction. His SUV traveled backward at a fast pace, estimated by witnesses to range between twenty to thirty-five miles per hour. The SUV had to stop at least two times in order to correct its direction and to avoid pedestrians in its path. Some of them yelled at it or jumped out of its path. The defendant had backed approximately halfway up Symphony Road when the obstacle of an overturned car forced him to stop.

At that point several police officers, who had observed the movement of the SUV and who had yelled for it to stop, ran toward it and called to the defendant to stop the vehicle and to get out. The defendant then shifted into drive and accelerated forward back down Symphony Road and away from the police. The SUV reached speeds estimated by witnesses to range between thirty and sixty miles per hour; pedestrians in the street scattered. Along Symphony Road the vehicle struck five persons. One,

---

[3]The defendant testified that he had four or five beers. The arresting police officer testified that the defendant had stated that he had drunk five or six beers.

James Grabowski, died as a result of his injuries. A second, Jason Stackiewicz, suffered a severe head injury, a broken femur, and a fractured nose. A third, Joshua Bersey, suffered fractures to the left and right sides of his skull and a broken nose.[4]

At the end of Symphony Road, the defendant turned left against the one-way direction of St. Stephen Street, and then broke off through two public alleyways. He emerged from the second alleyway onto Westland Avenue, collided with a taxicab, and came to a stop.

Police officers approached and arrested him. One of the arresting officers detected a strong smell of alcohol from within the SUV. The same officer observed the defendant's eyes to be glassy and bloodshot, his clothes disheveled, and his gait unsteady. A second officer read the defendant his Miranda rights. Still at the scene, the defendant told the officers that he had drunk five or six beers that night. Because the defendant was walking with difficulty, the police assisted him to a patrol wagon. The patrol wagon brought him to a station house at approximately 12:15 A.M.

At the station, officers placed the defendant in a holding cell. At around 2:00 A.M., an officer asked the defendant to perform a field sobriety test. The defendant passed the test. The officer then asked the defendant whether he wished to take a breathalyzer test. The defendant declined. Two hours later, the defendant changed his mind and requested a breathalyzer test. At approximately 4:27 A.M., and again at 4:30 A.M., he provided two breath samples. Both samples measured .09 percent blood alcohol content by weight.

For the death of James Grabowski the jury found the defendant guilty of involuntary manslaughter; for the severe head injury of Jason Stackiewicz, they found the defendant guilty of aggravated assault and battery by means of a dangerous weapon, his automobile, and of operating under the influence of intoxicating liquor and causing serious bodily injury; and for the severe head injuries of Joshua Bersey, they again found the defendant

---

[4]A resident viewed the scene from her apartment window at 32-34 Symphony Road. She videotaped the backward course of the SUV up to the point of the overturned car and then its forward course back down Symphony Road. The videotape came into evidence.

guilty of aggravated assault and battery by means of a danger-
ous weapon, his automobile, and of operating under the influ-
ence of intoxicating liquor and causing serious bodily injury.

*Analysis.* The central contention of the defendant is that the
admission of his breathalyzer results without explanatory
testimony from an expert witness negates the verdicts upon the
alcohol-related offenses and taints the findings of guilt upon the
nonalcohol-related offenses. Because the defendant did not
preserve these issues at trial, we examine them under the
substantial risk of a miscarriage of justice standard; that is, we
consider whether an error occurred and, if so, whether the error
may have "materially influenced" the verdicts. *Commonwealth*
v. *Freeman*, 352 Mass. 556, 564 (1967). See *Commonwealth* v.
*Alphas*, 430 Mass. 8, 13 (1999); *Commonwealth* v. *Randolph*,
438 Mass. 290, 297-298 (2002) (both cases emphasizing assess-
ment of any error in the context of the entire trial).

1. *Alcohol-related offenses.* As the judge accurately instructed
the jury, a verdict of guilt on the charges of operating under the
influence of intoxicating liquor and causing serious bodily injury,
G. L. c. 90, § 24L(2), required the Commonwealth to prove
beyond a reasonable doubt that (1) the defendant had operated a
motor vehicle, (2) upon a public way or place to which members
of the public had access as invitees or licensees, (3) while he
was under the influence of intoxicating liquor (the OUI ele-
ment), (4) so as to cause serious bodily injury to a victim.[5] Com-
pare *Commonwealth* v. *Flanagan*, 76 Mass. App. Ct. 456, 463
(2010) (G. L. c. 90, § 24L[1]). The Commonwealth could estab-
lish the OUI element by either of two methods. By the "per se"
method, it could introduce evidence of a breathalyzer reading of
.08 percent or greater and request the judge to instruct the jury
that, if they believed the accuracy of that measure, it conclusively
established operation under the influence. Alternatively, by the
method of proof by impaired operation, the prosecution could
introduce percipient evidence of the defendant's appearance and
conduct and a breathalyzer result of .08 percent or greater without
a request for an instruction that such a reading, if believed,

---

[5]Upon appeal, the defendant does not challenge any portion of the detailed
instructions of the trial judge defining the prima facie elements of any charged
offense.

conclusively established operation under the influence. In the latter instance, however, the prosecution would be required to support the .08 percent result with expert testimony explaining the relationship between that measure and impaired operation. *Commonwealth* v. *Colturi*, 448 Mass. 809, 817-818 (2007). See *Commonwealth* v. *Hubert*, 71 Mass. App. Ct. 661, 662 n.2 (2008), *S.C.*, 453 Mass. 1009 (2009).

In the present case, the Commonwealth did not request an instruction embodying the per se theory. Rather, the prosecutor requested the judge to instruct the jury that the .08 percent measure permitted the jury to draw the reasonable inference that the defendant had been operating under the influence. The Commonwealth had introduced the testimony of an expert witness, a toxicologist. However, his testimony focused primarily upon the process of retrograde extrapolation, a method for estimation of a person's blood alcohol content at points in time prior to the moment of the breathalyzer test. That expert provided the opinion that the defendant's readings of .09 at 4:27 A.M. and 4:30 A.M. enabled projections of higher amounts of .10 percent to .14 percent as of 2:15 A.M. and inferably higher amounts two and one-half hours earlier, at the time of the events on Symphony Road.

However, the expert never explained the fundamental connection between the amounts of blood alcohol content and the punishable condition of impairment: the diminished capacity to operate a motor vehicle safely. The omission of that explanatory connection, in the words of the *Colturi* decision, left the jury "to guess at [the] meaning" of the breathalyzer measurements. 448 Mass. at 818. Consequently, in the absence of the per se theory instruction and of an impairment theory expert opinion, proof of the elements of operating under the influence was deficient.[6]

Deficient proof of the OUI element requires reversal of the

---

[6]This trial in September of 2006 proceeded during an interim of uncertainty between the time of the amendment of the pertinent OUI statutes by the Legislature on June 30, 2003, and the delivery of the *Colturi* decision on April 19, 2007. By the amendments, see St. 2003, c. 28, §§ 1 and 4, the Legislature revised G. L. c. 90, § 24(1)(*a*)(1), to provide that a driver "with a percentage, by weight, of alcohol in [his] blood of [.08] or greater, or while under the influence of intoxicating liquor . . . *shall be punished* . . ." (emphasis

convictions of the alcohol-related crimes charged as a result of the serious bodily injuries to Jason Stackiewicz and Joshua Bersey.

2. *The nonalcohol-related offenses.* The defendant maintains that the flawed findings of operating under the influence undermine the separate verdicts of guilt of involuntary manslaughter resulting from the death of James Grabowski and of aggravated assault and battery by means of a dangerous weapon resulting from the injuries to Jason Stackiewicz and Joshua Bersey. He submits that the prosecutor's closing argument implicitly caused the jury to view intoxication or impairment as an element of the independent offenses. In particular, he points to the prosecutor's contention that the defendant's motive for his violent forward drive down Symphony Road was to escape police detection of his intoxication.

The argument boils down to speculation. The judge instructed the jury precisely and accurately upon the elements of each offense. For involuntary manslaughter, those elements consisted of (1) wanton or reckless conduct (2) causing (3) an unintentional and unlawful killing. See *Commonwealth* v. *Gonzales*, 443 Mass. 799, 808 (2005), and cases cited. For aggravated assault and battery by means of a dangerous weapon, the elements consisted of (1) wanton or reckless conduct (2) causing (3) serious physical or bodily injury (4) by means of a dangerous weapon or instrument, such as a motor vehicle. See *Commonwealth* v.

supplied). At the same time, it eliminated from a related provision of G. L. c. 90, § 24(1)(*e*), the clause creating a permissible inference of operating under the influence from a result of .08 or greater. Counsel and the judge in our case did not have the benefit of *Colturi's* elaboration upon the consequences of these revisions. See, e.g., *Commonwealth* v. *Douglas*, 75 Mass. App. Ct. 643, 650-653 & n.12 (2009).

Here the prosecution did not appear to realize that, as a result of the 2003 amendments, a breathalyzer result of .08 or higher accepted by the jury conclusively established a defendant's impairment. After the judge had instructed the jury, the prosecutor at side bar asked her to add an instruction that a test result of .08 or higher *permitted* the jury to draw an inference of impairment (the state of the law before the 2003 amendments). The judge declined to give that instruction upon the ground that the breathalyzer consent form, in evidence as an exhibit, already informed the jury of the significance of the reading. In fact, the consent form correctly informed the breathalyzer subject and ultimately the jury that a .08 measure conclusively established a per se violation of the OUI statute. In these circumstances, the prosecutor effectively bypassed his entitlement to the per se instruction.

*Cruzado,* 73 Mass. App. Ct. 803, 807 (2009). See also *Commonwealth* v. *Vick,* 454 Mass. 418, 432 & n.14 (2009).

Neither offense contains any element relating to impairment by alcohol. The jury instructions came after the closing argument of counsel. The instructions included the usual caveat that closing arguments do not constitute evidence. The reviewing court presumes that jurors follow the judge's instructions. See *Commonwealth* v. *Pope,* 406 Mass. 581, 588 (1990); *Commonwealth* v. *Degro,* 432 Mass. 319, 328 (2000). Nothing in the record indicates that the jury did not do so in this case. Neither the argument of the prosecutor nor the instruction of the judge suggested to the jury that the presence of impairment equaled or heightened the probability of the commission of manslaughter or of aggravated assault and battery. The prosecutor was entitled to argue motive. Neither he nor the judge left the jury with any impression that motive was an element of an offense.

As a matter of evidentiary realities, this argument is improbable also. The Commonwealth did not realize that the evidence of the .09 breathalyzer result (admitted without objection) constituted a prima facie case of impaired operation. Its failure to request a conforming instruction to that effect was fortuitous for the defendant. The defendant's resulting argument attempts to convert the fortuitous avoidance of the alcohol-related charges to the categorical evasion of all charges. The quantity and quality of evidence of the independent charges and the accuracy of the instructions upon them preclude that result. No error, preserved or unpreserved, undermines the convictions upon the nonalcohol-related offenses.

3. *Omission of a requested accident instruction.* Finally, the defendant contends that his trial counsel's omission of a request for an instruction upon the defense of accident amounted to constitutionally ineffective assistance. The preferred process for presentation of that claim is not direct appeal, but rather a motion for a new trial directed to the original trial judge. *Commonwealth* v. *Zinser,* 446 Mass. 807, 810-811 (2006). A "narrow" exception to the preferred procedure permits the contention on direct appeal if the factual basis of the claim "appears indisputably on the trial record." *Id.* at 811, quoting from *Commonwealth* v. *Adamides,* 37 Mass. App. Ct. 339, 344 (1994). The exception

may arise not only if the pertinent record shows the presence of the factual basis for the claim, but also if it shows the absence of such a factual basis. The second situation appears here. The defendant's entitlement to an accident instruction depended entirely upon the evidence received by the jury. The record of that evidence will not change through any subsequent motion practice. Its fixed and final nature enables direct assessment of the claim.

Under the familiar standard, the defendant must show that his attorney's performance (1) fell "measurably below that which might be expected from an ordinary fallible lawyer," and (2) that it "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

A defendant is entitled to an accident instruction only if "the evidence fairly raises the possibility of accident." *Commonwealth* v. *Jewett*, 442 Mass. 356, 370 (2004). As pertinent here, an accident is an "unintentional event occurring through inadvertence, mistake, or negligence," and not an event resulting from wanton or reckless conduct. *Commonwealth* v. *Figueroa*, 56 Mass. App. Ct. 641, 650 (2002). Here, the overwhelming evidence substantiated an episode of extraordinarily wilful, wanton, or reckless conduct: the acceleration during the nighttime both backward and forward through a narrow street choked with milling pedestrians. Compare *Commonwealth* v. *Doyle*, 73 Mass. App. Ct. 304, 309 (2008) (accident instruction not justified where defendant operated vehicle at high speed and intentionally swerved, causing an unintentional crash killing three child passengers, none of whom was wearing a seat belt).

Because the evidence failed to support any reasonable possibility of accident, the defendant was not entitled to the instruction. Trial counsel's omission of a futile tactic constituted no fault, caused the defendant no harm, and will not support any claim of ineffective assistance. See *Commonwealth* v. *Gambora*, 457 Mass. 715, 731 n.24 (2010), citing *Commonwealth* v. *Conceicao*, 388 Mass. 255, 264 (1983); *Commonwealth* v. *Delong*, 72 Mass. App. Ct. 42, 51 (2008).

*Conclusion.* For these reasons we reverse the judgments and set aside the verdicts upon the two convictions of operating

under the influence of intoxicating liquor and causing serious bodily injury; and we affirm the judgments upon the conviction of involuntary manslaughter and upon the two convictions of aggravated assault and battery by means of a dangerous weapon.

*So ordered.*

MILKEY, J. (concurring). I agree wholeheartedly with much of the majority's well-crafted decision, and in particular, I agree that, in light of the Commonwealth's theory of the case, there was error with regard to those convictions that depended on the defendant's having operated his vehicle under the influence (OUI convictions). I respectfully disagree on whether that error so prejudiced the defendant as to warrant reversal of the OUI convictions, and I join in that disposition only because I believe it is mandated by an earlier decision of this court. See *Commonwealth* v. *Douglas*, 75 Mass. App. Ct. 643, 653 (2009).

Because the defendant did not preserve his claim of error, we are left to consider only whether the error created "a substantial risk of a miscarriage of justice." For that standard to be met, there has to be "serious doubt whether the result of the trial might have been different had the error not been made." *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999). "Errors of this magnitude are extraordinary events and relief is seldom granted." *Commonwealth* v. *Randolph*, 438 Mass. 290, 297 (2002), citing *Commonwealth* v. *Amirault*, 424 Mass. 618, 646-647 (1997). "In analyzing a claim under the substantial risk standard, '[w]e review the evidence and the case as a whole.' " *Ibid.*, quoting from *Commonwealth* v. *Azar*, 435 Mass. 675, 687 (2002).

The error at issue here was revealed by the Supreme Judicial Court's ruling in *Commonwealth* v. *Colturi*, 448 Mass. 809, 817-818 (2007), which was issued after the defendant's trial concluded. That decision also made plain that, as a result of a 2003 legislative amendment, the Commonwealth can now establish a "per se" OUI violation by demonstrating that a defendant had a blood alcohol content of .08 or higher. The jury had before it the defendant's .09 breathalyzer result, which the

defendant did not demonstrate (or even argue) was inaccurate. The test was administered many hours after the incident, but the Commonwealth presented expert testimony that the defendant's blood alcohol would have measured significantly higher at the relevant time.

In this manner, and through other evidence as well, the Commonwealth provided the jury with overwhelming proof that the defendant violated the OUI statute, even if it stumbled by failing to request a set of instructions that fully took advantage of that proof. Had the jury received full and proper instructions in accordance with the principles enunciated in *Commonwealth* v. *Colturi, supra*, then I believe that — far from there being "serious doubt whether the result of the trial might have been different" — there is a near certainty that the jury would have come out the same way it did. Under these circumstances, I have difficulty discerning any substantial risk that justice miscarried, and I would be inclined to affirm all the convictions. I nevertheless concur in reversing the OUI convictions because I believe our decision is controlled by *Commonwealth* v. *Douglas*, 75 Mass. App. Ct. at 653 (substantial risk of miscarriage of justice found under very similar circumstances).