# United States Court of Appeals
## For the First Circuit

No. 11-1156

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL HART,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin and Lipez, Circuit Judges,
and Smith,[*] District Judge.

Mark W. Shea, with whom Jean LaRoque, were on brief, for appellant.
Dina Michael Chaitowitz, with whom Glenn A. MacKinlay, were on brief, for appellee.

March 16, 2012

---

[*]Of the District of Rhode Island, sitting by designation.

**SMITH**, **District Judge**.  Michael Hart was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and now appeals from his conviction and sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e) ("ACCA").  Hart argues that the district court erred in denying his motion to suppress all evidence seized incident to a Terry stop, including a firearm.  He additionally claims that the district court erred in concluding that his prior conviction for assault and battery with a dangerous weapon ("ABDW") qualified as a predicate offense under ACCA.  For the reasons set forth below, we affirm both the conviction and sentence.

## I.

We begin by outlining the facts, reciting them "as the trial court found them, consistent with record support." United States v. Am, 564 F.3d 25, 27 (1st Cir. 2009) (quoting United States v. Ruidíaz, 529 F.3d 25, 27 (1st Cir. 2008)) (internal quotation marks omitted).  The district court held a two-day evidentiary hearing on Hart's motion to suppress at which Trooper Marc Lavoie, Trooper Jimi Grasso, and Ms. Tiffany Gomes testified.

On July 7, 2009, five Massachusetts State Police troopers assigned to the Southeastern Massachusetts Gang Task Force, including Lavoie and Grasso, were dispatched to the area of 102 Griffin Court in New Bedford.  Three males had escaped from a

Massachusetts Department of Youth Services detention center, and the officers were investigating their whereabouts.

Trooper Lavoie testified that the troopers had been provided with photographs and physical descriptions of the three escapees, including information on height, weight, and race, though Grasso testified that he was only briefed on racial information. Troopers Grasso and Lavoie saw Hart speaking with a woman at the rear of 102 Griffin Court, and both troopers testified that, from a distance, they believed Hart might have been one of the escapees. Hart, however, was at least six inches taller, more than ten years older, and one-hundred pounds heavier than any of the fugitives. His race was the only characteristic he shared with any of the escapees.

Though the troopers were not in uniform, they were wearing jackets with gang task force insignia. The troopers proceeded in Hart's direction, and Hart appeared startled to see them. Also noting the troopers, the woman with whom he was speaking yelled into the house that the police were approaching.

At that point, Hart walked briskly away from the troopers and toward a gray vehicle parked in a nearby alley, bending over slightly and clutching at his waist as he went. Based on their training and experience, the troopers believed Hart was carrying a concealed weapon.

Trooper Lavoie followed Hart and observed him turn, or "blade," his body so as to shield his movement from the troopers' view as he entered the passenger side of the vehicle. Despite Hart's best efforts, Lavoie observed him reach his hand under his shirt and remove an object from his belt area. Sitting down, Hart deposited the object between his seat and the door.

Behind the wheel was Tiffany Gomes, a woman with whom Hart had an intimate relationship, who had been waiting for him while he visited friends at 102 Griffin Court. Trooper Lavoie moved to the driver's side of the vehicle and told Gomes to put the car in park and turn off the engine.

At Trooper Lavoie's request, Hart produced identification, and the trooper recognized Hart as a member of the Montes Park street gang. Hart rocked back and forth in his seat, not meeting the trooper's eyes, and then placed his hands on the dashboard without being asked, behavior Lavoie found peculiar.

Trooper Grasso joined Lavoie and, both moving to the passenger side, ordered Hart out of the car. Hart appeared very nervous to both troopers; when asked if he had anything on him Hart responded, "Who me? I don't think so," before looking at the area between the seat and the door. Trooper Lavoie followed Hart's gaze and saw plainly the handle of a handgun.

As one of the troopers handcuffed Hart, he yelled out, "It's all mine, [Gomes] has nothing to do with it." The troopers

retrieved the firearm, a .40 caliber Baretta loaded with ten rounds of ammunition.  Hart was read his <u>Miranda</u> rights, and he admitted possession of the gun and described it in accurate detail.

A federal grand jury returned a one-count indictment on December 2, 2009, charging Hart with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). After an unsuccessful attempt to suppress the evidence, Hart entered a conditional plea of guilty, the district court concluded that his criminal record contained three ACCA predicate offenses, and Hart was sentenced to 180 months' imprisonment, the statutory minimum under ACCA.

## II.

### A.    The Motion to Suppress

On appeal, Hart challenges the denial of his motion to suppress the evidence seized during his encounter with Troopers Lavoie and Grasso.  First, Hart argues the troopers lacked reasonable suspicion to conduct a <u>Terry</u> stop.  <u>See</u> <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 19-20 (1968).  Hart next takes issue with the propriety of the troopers' actions after they initiated the stop.  Finally, Hart argues that the district court committed clear error in finding that the firearm was in plain view.

We review findings of historical fact -- and inferences drawn from those facts -- for clear error, which exists when we are left with a "definite and firm conviction that a mistake has been

committed." United States v. Wright, 582 F.3d 199, 205 (1st Cir. 2009) ("Wright II") (quoting United States v. Espinoza, 490 F.3d 41, 46 n.2 (1st Cir. 2007)) (internal quotation marks omitted). We review legal conclusions made on the denial of a suppression motion de novo. United States v. McGregor, 650 F.3d 813, 819-20 (1st Cir. 2011). This Court "will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it." Wright II, 582 F.3d at 205-06 (quoting United States v. Coccia, 446 F.3d 233, 237 (1st Cir. 2006)) (internal quotation marks omitted).

A temporary police detention constitutes a seizure and, therefore, must be reasonable. Ruidíaz, 529 F.3d at 28 (citing Terry, 392 U.S. at 19; United States v. Chhien, 266 F.3d 1, 5-6 (1st Cir. 2001)). Officers must have reasonable suspicion, that is, "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). The officer's suspicion must be both particular, in that it is "grounded in specific and articulable facts," United States v. Hensley, 469 U.S. 221, 229 (1985), and objective, such that a reasonable officer in similar circumstances also would harbor suspicion. See Espinoza, 490 F.3d at 47 (citing United States v. Romain, 393 F.3d 63, 74 (1st Cir. 2004)). An inquiry into reasonableness requires a reviewing court to consider the totality of the surrounding circumstances, "tak[ing] care not to evaluate facts in splendid isolation" but

-6-

"apprais[ing] [them] in the context in which they occurred." United States v. Pontoo, 666 F.3d 20, 29 (1st Cir. 2011); see also Ruidíaz, 529 F.3d at 29 (stating that a reasonableness determination requires a reviewing court to evaluate the totality of the circumstances (citing Romain, 393 F.3d at 71)).

The Supreme Court has held that a defendant's apprehensive, evasive behavior may further heighten reasonable suspicion and that flight from law enforcement is a clear act of evasion. Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citations omitted). We have described flight as unprovoked running upon recognizing the police, Wright II, 582 F.3d at 210, and have concluded that acts like warily looking over one's shoulder contribute to an officer's reasonable suspicion. United States v. Aitoro, 446 F.3d 246, 252 (1st Cir. 2006). An officer may stop an individual in order to "resolve the ambiguity" in conduct that is lawful but oblique and unusual. Wardlow, 528 U.S. at 125.

The district court concluded that the stop was justified based on officer safety, reasoning that officers securing an area to conduct an investigation could stop an individual present at the scene whom they reasonably suspected of concealing a weapon. Hart counters that officer safety only becomes relevant after officers have executed a legitimate Terry stop. We may affirm the district court's decision on any ground made manifest in the record, Spencer v. Roche, 659 F.3d 142, 145 (1st Cir. 2011), and we do not reach

-7-

Hart's contention as to the district court's rationale because, based on the totality of the circumstances, we hold that the troopers had reasonable suspicion to stop Hart.

Here, Hart's reaction to the police revealed a "series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." Terry, 392 U.S. at 22. The record reveals that Hart appeared startled to see the police and almost immediately stepped quickly away from them. He hunched over while he walked; his hand never left his waistband. Entering the vehicle, Hart attempted to shield his movement from the troopers' view, but Lavoie saw him pull an object from his waistband and place it beside his seat. Observing this factual medley, Trooper Lavoie reasonably suspected that Hart was engaged in criminal mischief.[1] See Wright II, 582 F.3d at 212-13 (holding that officers had reasonable suspicion where defendant leaned forward in the back seat of a car, quickly exited as if recognizing an unmarked car as a police car, ran in the opposite direction, clutched at his side, and refused to stop when commanded); see also Aitoro, 446 F.3d at 252-53 (concluding that officers had reasonable

---

[1] One factor in evaluating the totality of the circumstances is the character of the area in which the defendant was seized, a factual issue on which the district court made no finding. See United States v. Wright, 485 F.3d 45, 53-54 (1st Cir. 2007) ("Wright I") (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). The government urges us to draw our own conclusion; however, we decline this invitation because this is a factual issue best left to the district court and, in the end, not necessary to our conclusion.

-8-

suspicion where defendant was apprehended in a high-crime area, exclaimed "Oh shit" upon seeing the police, ran in the opposite direction, looked warily over his shoulder, and clutched at his waistband where officers noticed a bulge); cf. United States v. Camacho, 661 F.3d 718, 726 (1st Cir. 2011) (holding that there was no reasonable suspicion where officers observed defendant walking in a normal fashion in the opposite direction of a recent street fight, and defendant did not appear apprehensive or nervous at the officers' approach).

Hart implies that, even if these observations suggest he was concealing a weapon, this may not form the basis for reasonable suspicion because carrying a concealed weapon is not a crime in Massachusetts. But what struck the troopers was not just that Hart appeared to be carrying a concealed object, but that he painstakingly concealed that object from their view and attempted to hide it in the vehicle. Hart's behavior signaled that what he carried was unlawful and, therefore, caused the troopers to reasonably suspect criminal conduct.

Next, Hart disputes the propriety of the troopers' actions after they initiated the investigatory stop.[2] An officer's conduct throughout a Terry encounter must be "fairly responsive to

---

[2] Hart specifically argues that the troopers lacked reasonable suspicion to search him pursuant to the investigatory stop. Yet, the record indicates that the troopers never actually conducted a protective frisk. We can only assume, as the government did in its briefing, that Hart's argument pertains to the scope of the Terry encounter, which concluded when the troopers discovered the gun.

-9-

the emerging tableau," Chhien, 266 F.3d at 6, and reasonableness is the touchstone. Romain, 393 F.3d at 71; see also Ruidíaz, 529 F.3d at 29 ("The propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold." (quoting Romain, 393 F.3d at 71) (internal quotation marks omitted)).

The parties agree that Trooper Lavoie initiated the stop when he asked Gomes to place the car in park and turn off the engine. From there, Hart was recognized as a member of the Montes Park gang, appeared nervous, rocked back and forth in his seat, avoided eye contact, and placed his hands on the dashboard without being asked. It was at this point that the troopers, already suspecting Hart had a weapon, ordered him out of the car and discovered the handgun in plain view. Based on the unfolding events, both preceding and pursuant to the investigatory stop, we conclude that the officers responded reasonably throughout the encounter. See Ruidíaz, 529 F.3d at 29.

Finally, Hart argues that it was clear error for the district court to credit the troopers' testimony that the firearm was in plain view. Instead, he urges that the district court should have credited Gomes's testimony that the gun was located in a plastic bag in the backseat of the vehicle. We review credibility findings for clear error, a standard highly deferential to the district court's conclusions. McGregor, 650 F.3d at 820.

In assessing the credibility of the various witnesses, the district court was well within its discretion. Among other things, the court noted that Gomes was not initially honest about her intimate relationship with Hart and that this relationship, once revealed, established a bias. We defer to the district court's conclusion that the troopers' testimony was more credible concerning the location of the gun.

Accordingly, we affirm the district court's denial of Hart's motion to suppress.

## B.   ACCA Predicate Offense

We move on to the sentencing issue raised by the defendant. To be sentenced pursuant to ACCA, Hart had to have been convicted of three prior violent felonies, serious drug offenses, or a combination thereof. 18 U.S.C. § 924(e)(1). We review de novo whether Hart's Massachusetts conviction for ABDW categorically qualifies as an ACCA predicate offense. See United States v. Dancy, 640 F.3d 455, 464 (1st Cir. 2011) (citing United States v. Pakala, 568 F.3d 47, 54 (1st Cir. 2009)).

ACCA defines a "violent felony" as

> any crime punishable by imprisonment for a term exceeding one year . . . that --
>    (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>    (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

-11-

18 U.S.C. § 924(e)(2)(B). Clause (i) is referred to as the "force clause," while the portion of clause (ii) following the enumerated offenses is called the "residual clause." Dancy, 640 F.3d at 465 (citing United States v. Holloway, 630 F.3d 252, 256 (1st Cir. 2011)).

Under either clause, we take a categorical approach in determining whether a conviction qualifies as an ACCA predicate offense, meaning we "consider only the offense's legal definition, forgoing any inquiry into how the defendant may have committed the offense." Holloway, 630 F.3d at 256 (citing Begay v. United States, 553 U.S. 137, 141 (2008); Taylor v. United States, 495 U.S. 575, 600 (1990)). State court construction of the relevant state law dictates our result. Holloway, 630 F.3d at 259. Our analysis is complete if the statute subsumes only ACCA predicate offenses. See id. Where the statute encompasses multiple offenses, and not all of the offenses qualify as ACCA predicates, a district court may consult so-called Shepard documents -- which include the indictment, plea colloquy, and jury instructions -- to determine the offense of conviction. United States v. Giggey, 589 F.3d 38, 41 (1st Cir. 2009) (citing Shepard v. United States, 544 U.S. 13, 26 (2005); Taylor, 495 U.S. at 602). If the Shepard documents prove inconclusive, such that the court cannot ascertain the

-12-

offense of conviction, the conviction cannot qualify as an ACCA predicate. Holloway, 630 F.3d at 257.

An offense qualifies under ACCA's residual clause if it is "burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."[3]  18 U.S.C. § 924(e)(2)(B)(i).  The offense must (1) present a degree of risk similar to the degree of risk posed by the enumerated offenses, and (2) be roughly similar in kind to the enumerated offenses.  Begay, 553 U.S. at 143. Offenses similar in kind "typically involve purposeful, violent, and aggressive conduct."  Id. at 144-45 (citation and internal quotation marks omitted); see also Dancy, 640 F.3d at 466.

We have previously held that Massachusetts assault with a dangerous weapon ("ADW") qualifies as an ACCA predicate offense under the force clause,[4] Am, 564 F.3d at 33, and that ABDW is a predicate offense under the residual clause of the career offender

---

[3] We reject Hart's argument that the residual clause is unconstitutionally vague.  See James v. United States, 550 U.S. 192, 210 n.6 (2007) ("The statutory requirement that an unenumerated crime 'otherwise involv[e] conduct that presents a serious potential risk of physical injury to another' is not so indefinite as to prevent an ordinary person from understanding what conduct it prohibits.") (alteration in original) (citation omitted).

[4] ADW is a lesser-included offense of ABDW.  See Commonwealth v. Appleby, 402 N.E.2d 1051, 1058 (Mass. 1980).

provision of the United States Sentencing Guidelines, U.S.S.G. § 2K2.1(a)(2).[5] <u>United States</u> v. <u>Glover</u>, 558 F.3d 71, 79-82 (1st Cir. 2009). Hart urges us to revisit our ABDW precedent in light of the Supreme Court's decision in <u>Johnson</u> v. <u>United States</u>, 130 S. Ct. 1265 (2010), and our subsequent decision in <u>United States</u> v. <u>Holloway</u>, 630 F.3d at 262.

<u>Johnson</u> called for federal courts to use state court construction of state law in determining whether a state conviction qualified as a predicate offense under ACCA. 130 S. Ct. at 1269. The <u>Johnson</u> Court determined that a slight touching, "such as a tap on the shoulder without consent," would satisfy a Florida battery statute, and concluded that such a conviction did not categorically qualify as a violent felony under ACCA's force clause. <u>Id.</u> at 1269-71 (quoting <u>State</u> v. <u>Hearns</u>, 961 So.2d 211, 219 (Fla. 2007)) (alteration and internal quotation marks omitted). <u>Johnson</u> prompted our decision in <u>Holloway</u>, in which we held that a conviction for Massachusetts simple assault and battery ("AB") did not bring the crime under the purview of ACCA's residual clause because the statute encompasses reckless simple AB, an offense which does not involve the requisite purposeful conduct. <u>Holloway</u>,

---

[5] The Sentencing Guidelines' term "crime of violence" and ACCA's term "violent felony" are defined almost identically. <u>See</u> <u>United States</u> v. <u>Holloway</u>, 630 F.3d 252, 254 n.1 (1st Cir. 2011) (citing <u>United States</u> v. <u>Willings</u>, 588 F.3d 56, 58 n.2 (1st Cir. 2009)). Accordingly, "decisions construing one term inform the construction of the other." <u>Id.</u> (quoting <u>Willings</u>, 588 F.3d at 58 n.2) (internal quotation marks omitted).

630 F.3d at 262; see also Dancy, 640 F.3d at 467. Hart argues that, because ABDW also may be committed recklessly, it cannot qualify as a categorical ACCA predicate. Accordingly, we consider whether our holding in Holloway requires a different result than the one obliged by Glover, and we conclude that it does not.

Pursuant to the residual clause analysis as outlined in Begay, we first evaluate ABDW's comparative degree of risk. 553 U.S. at 143. The Massachusetts ABDW statute criminalizes "an assault and battery upon another by means of a dangerous weapon," Mass. Gen. Laws ch. 265, § 15A(b), and the Massachusetts Supreme Judicial Court has defined the offense to require

> that the elements of assault be present, that there be a touching, however slight, that that touching be by means of the weapon, and that the battery be accomplished by use of an inherently dangerous weapon, or by use of some other object as a weapon, with the intent to use that object in a dangerous or potentially dangerous fashion.

Commonwealth v. Appleby, 402 N.E.2d 1051, 1059 (Mass. 1980) (internal citations omitted).

ABDW clearly poses a serious potential risk of injury, comparable to the degree of risk posed by the enumerated offenses, as the definitional element of the crime is a touching by means of a dangerous weapon. See Glover, 558 F.3d at 81. Massachusetts case law recognizes that weapons may be dangerous either "per se" or "as used." Appleby, 402 N.E.2d at 1056-57, 1059. A per se

-15-

dangerous weapon is an instrumentality designed to cause death or great bodily harm, and defendants "are charged with knowledge of [its] inherently dangerous nature," Appleby, 402 N.E.2d at 1059 n.6 (citations omitted); see also Commonwealth v. Farrell, 78 N.E.2d 697, 702 (Mass. 1948), whereas an otherwise innocent instrument is considered a dangerous weapon if, "as used by the defendant, [it] is capable of producing serious bodily harm."[6]  Commonwealth v. Tevlin, 741 N.E.2d 827, 833 (Mass. 2001) (citations omitted) (internal quotation marks omitted); see also Appleby, 402 N.E.2d at 1057 (listing cases); Farrell, 78 N.E.2d at 702.  In light of these definitions, "logic dictates that ABDW ineluctably poses a serious potential risk of physical injury" because the defendant effected the touching with an instrument designed to cause, or wielded an object in a manner capable of producing, serious bodily harm. Glover, 558 F.3d at 81.

The second prong of the Begay inquiry requires an offense to be roughly similar in kind to the enumerated offenses in that it must "typically involve purposeful, violent, and aggressive conduct."  553 U.S. at 144-45.  Hart seizes on the characteristic of purposefulness, maintaining that ABDW categorically cannot be classified as an ACCA predicate because the statute encompasses

---

[6] Whether a weapon is found dangerous as used depends on the characteristics of the object, the way in which the defendant manipulated it, and the details surrounding the assault and the use of the instrument.  Commonwealth v. Tevlin, 741 N.E.2d 827, 833 (Mass. 2001) (citation omitted).

reckless conduct, see Holloway, 630 F.3d at 261, and he points to several Massachusetts cases in which ABDW was committed recklessly. See, e.g., Commonwealth v. Cruzado, 901 N.E.2d 1245, 1249 (Mass. App. Ct. 2009); Commonwealth v. Fettes, 835 N.E.2d 639, 640 (Mass. App. Ct. 2005); Commonwealth v. Burno, 487 N.E.2d 1366, 1369 (Mass. 1986); Commonwealth v. Broderick, 450 N.E.2d 1116, 1117 (Mass. App. Ct. 1983); see also Commonwealth v. Filoma, 943 N.E.2d 477, 482-83 (Mass. App. Ct. 2011). It is true that an ABDW conviction may rest on a recklessness theory,[7] and it is not insignificant that reckless ABDW may be committed with a seemingly innocent object used in a dangerous fashion, as in the case of reckless, vehicular ABDW.[8] See, e.g., Cruzado, 901 N.E.2d at 1249; Burno, 487 N.E.2d

---

[7] Massachusetts ABDW may be committed (1) intentionally or (2) wantonly or recklessly. Commonwealth v. Burno, 487 N.E.2d 1366, 1368-69 (Mass. 1986). The former theory requires "the intentional and unjustified use of force upon the person of another, however slight." Id. (quoting Commonwealth v. McCan, 178 N.E. 633, 634 (Mass. 1931)) (internal quotation marks omitted); see also Commonwealth v. Ford, 677 N.E.2d 1149, 1151 (Mass. 1997). The latter calls for "the intentional commission of a wanton or reckless act (something more than gross negligence) causing physical or bodily injury to another." Burno, 487 N.E.2d at 1369 (citation omitted); see also Ford, 677 N.E.2d at 1151. In the case of reckless or wanton ABDW, the victim's injury must be "more than transient or trifling" and severe enough to interfere with health or comfort. Burno, 487 N.E.2d at 1370. Regardless of the underlying theory, ABDW requires "general intent to do the act causing injury," and proof of intent to commit the lesser-included offense of ADW will satisfy the inquiry. Appleby, 402 N.E.2d at 1059 ("Once an actor intends to commit assault with an object capable of causing bodily harm, he is threatening to use the instrumentality in a dangerous fashion." (footnote omitted)).

[8] In Massachusetts, conduct that underlies a conviction for operating under the influence ("OUI") and causing serious bodily

-17-

at 1369.  But this fact pattern does not represent the vast majority of ABDW convictions, and our analysis under the residual clause is explicitly, and necessarily, limited to the "ordinary case."  James v. United States, 550 U.S. 192, 208 (2007).

In United States v. Dancy, we examined the crime of assault and battery on a police officer ("ABPO"), and we observed that ABPO requires additional elements, which distinguish it from simple AB, ensuring the underlying conduct is typically purposeful as required by Begay.  Dancy, 640 F.3d at 469.  In that case, we suggested that ABDW, like ABPO, also includes additional elements that distinguish it from simple AB, see id. at 467, that is, ABDW requires the battery to be perpetrated by means of a dangerous weapon, Mass. Gen. Laws ch. 265, § 15A(b).  In contrast to simple AB, which merely requires "that the defendant's conduct involve[] a high degree of likelihood that substantial harm will result to another" or "disregard of probable harmful consequences to another" resulting in injury, Holloway, 630 F.3d at 261 (quoting

---

injury may also be charged as ABDW.  See, e.g., Commonwealth v. Filoma, 943 N.E.2d 477, 482-83 (Mass. App. Ct. 2011) (defendant convicted of ABDW and OUI causing serious bodily injury, but OUI conviction reversed for lack of evidence); Commonwealth v. Kenney, 772 N.E.2d 53, 54 n.1 (Mass. App. Ct. 2002) (noting that defendant was indicted for ABDW and OUI causing serious bodily injury, but acquitted of ABDW).  As Begay expressly held, a mere conviction for driving under the influence of alcohol ("DUI") does not qualify as an ACCA predicate, because DUI is a strict liability crime and does not typically involve purposeful, violent, and aggressive behavior. 553 U.S. at 144-46.  However, the conduct captured at the intersection of the ABDW and OUI statutes underlies a decided minority of ABDW cases.

Commonwealth v. Welch, 450 N.E.2d 1100, 1102-03 (Mass. App. Ct. 1983)) (internal quotation marks omitted), ABDW requires the defendant to have wielded a dangerous weapon and effectuated a touching using that weapon.

The objective of ACCA, moreover, is to identify prior convictions which indicate that "an offender, later possessing a gun, will use that gun deliberately to harm a victim." Begay, 553 U.S. at 145. The residual clause is broad by design to capture a range of crimes indicative of dangerousness. "Adjectives like 'purposeful' and 'aggressive' denote qualities that are ineluctably manifested in degree and appear in different combinations."[9] United States v. Williams, 529 F.3d 1, 7 (1st Cir. 2008) (footnote omitted). ACCA's enumerated offenses must only "typically" involve purposeful conduct, Dancy, 640 F.3d at 468 (quoting Begay, 553 U.S. at 144-45), and so we must look to the usual circumstances of the crime, "not allow[ing] hypothetical fact patterns" to negate commonsense. Dancy, 640 F.3d at 468. In considering the "ordinary case[]" of ABDW, James, 550 U.S. at 208, we must conclude that a composite of purposeful, violent, and aggressive conduct is the norm. See Begay, 553 U.S. at 144-45. Nothing in our holding in

---

[9] The enumerated offenses themselves demonstrate that "violent felony" describes a spectrum of dangerous conduct, embodying various attributes of purposefulness, violence, and aggression. For instance, burglary contemplates purposefulness, but not necessarily conduct that is deliberately violent or aggressive as a matter of course. United States v. Williams, 529 F.3d 1, 7 n.7 (1st Cir. 2008).

-19-

Holloway changes our conclusion in Glover, and we hold that a conviction for Massachusetts ABDW qualifies as a predicate offense under ACCA's residual clause, pretermitting the need to analyze it under the force clause.[10]

### III.

For the reasons provided above, we affirm Hart's conviction and sentence.

---

[10] We additionally note that the government, in its brief and in a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), argues that Hart's conviction for resisting arrest also qualifies as an ACCA predicate offense. Although the district court did not consider this conviction at sentencing, we agree with the government that Hart's resisting arrest conviction qualifies as an ACCA predicate. See United States v. Curet, No. 10-1176, 2012 WL 75392, at *11 n.12 (1st Cir. Jan. 11, 2012); United States v. Weekes, 611 F.3d 68, 72-73 (1st Cir. 2010), cert. denied, 131 S. Ct. 3021 (2011); see also United States v. Almenas, 553 F.3d 27, 34 (1st Cir. 2009) (holding that resisting arrest is a qualifying crime under the residual clause of U.S.S.G. § 4B1.2(a)).