NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1965                                          Appeals Court

COMMONWEALTH  vs.  NICOLAS DUTAN GUAMAN.


No. 14-P-1965.

Worcester.      May 2, 2016. – August 17, 2016.

Present:  Agnes, Massing, & Kinder, JJ.


Motor Vehicle, Operating under the influence,
     Homicide.  Homicide.  Wanton or Reckless
     Conduct.  Evidence, Spontaneous utterance.  Practice,
     Criminal, Required finding, Transcript of evidence,
     Duplicative punishment.



     Indictments found and returned in the Superior Court
Department on October 21, 2011.

     The cases were heard by David Ricciardone, J.


     Ethan C. Stiles for the defendant.
     Donna-Marie Haran, Assistant District Attorney, for the
Commonwealth.


     MASSING, J.  Following an afternoon of drinking beer, the

defendant, Nicolas Dutan Guaman, drove off in his pickup truck,

struck a motorcyclist, and continued to drive for several blocks

while dragging the victim to his death.  The defendant appeals

from his convictions of manslaughter while operating a motor vehicle under the influence of intoxicating liquor in violation of G. L. c. 265, § 13½ (OUI manslaughter), felony motor vehicle homicide in violation of G. L. c. 90, § 24G(a), and other related charges.[1]  He claims that the evidence was insufficient to prove that he knowingly engaged in wanton or reckless conduct to sustain his conviction of OUI manslaughter.  In addition, he contests evidentiary rulings admitting the recording of a 911 call and an English translation of his video-recorded sobriety tests.  We affirm, but because felony motor vehicle homicide is a lesser-included offense of OUI manslaughter and the defendant cannot be punished for both, we vacate the conviction and sentence for felony motor vehicle homicide.

Background.  As the defendant challenges the sufficiency of the evidence, we recite the facts in the light most favorable to the Commonwealth to determine whether a rational trier of fact could find the defendant guilty of the charges beyond a reasonable doubt.  See Commonwealth v. Latimore, 378 Mass. 671, 676-678 (1979); Commonwealth v. Giavazzi, 60 Mass. App. Ct. 374,

---

[1] Reckless endangerment of a child, G. L. c. 265, § 13L; leaving the scene of an accident causing death, G. L. c. 90, § 24(2)(a½)(2); failure to stop, G. L. c. 90, § 25; and operating a motor vehicle without a license, G. L. c. 90, § 10. The judge, sitting without a jury, found the defendant not guilty on an indictment charging him with second degree murder, G. L. c. 265, § 1.

376 (2004) ("There must be adequate evidentiary support for each essential element of the offense").

At about 7:50 P.M. on August 20, 2011, the defendant, driving his black Ford F-150 pickup truck with his six-year-old son Jonathan and his brother as passengers, rolled through a stop sign on Fayette Street in Milford.  Matthew Denice was driving his motorcycle up Congress Street when the defendant's truck pulled out in front of him.  As the victim quickly applied his brakes, the front driver's side of the truck hit the motorcycle.  Motorcycle and rider rolled over the hood of the truck, crashed into the windshield, and landed on the passenger's side.  After a moment's hesitation, the defendant quickly accelerated and drove south on Congress Street.

The victim, separated from his motorcycle, somehow got tangled with his legs beneath the chassis of the truck.  A number of people saw the defendant's truck drag the victim along the street.  At first the victim banged on the truck and yelled for the defendant to stop, but the truck continued moving down Congress Street, turned right on West Street, and then attempted to turn left on Bancroft Street.  The victim emitted "bloodcurdling" screams as he was dragged along the road.  As the truck drove on, dragging the victim for a nearly quarter of a mile, several witnesses banged on the truck or yelled for the

defendant to stop, but the defendant continued to drive, outpacing the people who were trying to get his attention.

Unable to turn left because of damage to the truck, the defendant drove onto the curb, put the truck in reverse, and then accelerated down Bancroft Street. This manoeuver released the victim, who was left lying in the street. One of the first police officers on the scene attended to the victim. When the officer removed the victim's helmet, he took a final breath and died.

Other officers pursued the defendant's truck. He ignored their lights and sirens and sped up. At last the defendant turned down a narrow street and the officers were able to force his truck to a stop. He did not respond to orders to get out of the truck, so the officers pulled him out. His eyes were bloodshot and extremely glassy, he was unsteady on his feet, and his breath smelled strongly of alcohol. The interior of the truck also reeked of alcohol and was littered with empty beer cans, open cans that were still cold, and the remainder of a thirty-pack of beer.

During the course of the arrest the police realized that the defendant did not speak English. A Spanish-speaking officer, Angel Arce, took over the arrest. Arce had little trouble communicating with the defendant, although it later became known that the defendant was a native of Ecuador and

spoke both the Quechua language and dialect of Spanish. The police took the defendant to the station, where Arce conducted sobriety tests and then booking procedures, which were video recorded. The defendant was unable to follow instructions and at one point informed Arce that he was having difficulty with the tests because he had drunk six beers.

The defendant had been drinking for several hours before he hit the victim's motorcycle. Earlier that afternoon, around 4:30 P.M., the defendant had driven his truck to his brother's apartment in Milford and parked behind the building. The defendant brought Jonathan with him, as well as a supply of beer. He already appeared drunk.

The defendant and his brother drank beer in and around the truck and the back porch, while Jonathan played in the backyard with his nine-year-old cousin Vivian (the defendant's brother's step-daughter) and other neighborhood children. After an hour or two, in which the defendant drank at least five cans of beer, the defendant, Jonathan, and his brother got in the truck to drive away. Concerned for her cousin's safety, Vivian told Jonathan not to get into the truck because his father was drunk. She also told the defendant not to take Jonathan. When the defendant nonetheless drove away with his son and brother, Vivian, scared and worried that something would happen, called her mother. When her mother arrived home soon after, Vivian

called 911 at 6:15 P.M. to report that the defendant was driving drunk with her cousin in the truck.

Discussion. 1. Sufficiency of the evidence -- wanton or reckless conduct. General Laws c. 265, § 13½, inserted by St. 2005, c. 122, § 20 (known as "Melanie's Law"), punishes "[w]hoever commits manslaughter while operating a motor vehicle in violation of paragraph (a) of subdivision (1) of section 24 of chapter 90." General Laws c. 90, § 24(1)(a), incorporated by reference in the OUI manslaughter statute, punishes operating a motor vehicle under the influence of intoxicating alcohol (OUI). Thus, G. L. c. 265, § 13½, consists of the elements of manslaughter plus the elements of OUI.

On the facts of this case, as in most scenarios in which OUI manslaughter would be charged, the crime requires proof of involuntary manslaughter based on wanton or reckless conduct.[2] See Commonwealth v. Liptak, 80 Mass. App. Ct. 76, 83 (2011). The elements of involuntary manslaughter are (1) that the

---

[2] "Alternatively, involuntary manslaughter may consist of a battery causing death in circumstances in which the defendant 'is, or should be, cognizant of the fact that the battery he is committing endangers human life.'" Commonwealth v. Knight, 37 Mass. App. Ct. 92, 103 (1994), quoting from Commonwealth v. Catalina, 407 Mass. 779, 787 (1990). A violation of G. L. c. 265, § 13½, could conceivably be proven under an involuntary manslaughter theory of battery or under a voluntary manslaughter theory of intentional infliction of injury, but such proof is often unavailable when a drunk driver causes a homicide -- and unnecessary when the driver's conduct is wanton or reckless.

defendant caused the victim's death, (2) that the defendant intended the conduct that caused the victim's death, and (3) that the defendant's conduct was wanton or reckless. See Commonwealth v. Welansky, 316 Mass. 383, 397 (1944) (Welansky); Commonwealth v. Life Care Centers of America, Inc., 456 Mass. 826, 832 (2010); Supreme Judicial Court Model Jury Instructions on Homicide 75 (2013).

The defendant challenges the sufficiency of the evidence only with respect to the mens rea element of wanton or reckless conduct (he does not contend that the evidence was insufficient to prove that he caused the victim's death while OUI). His defense at trial was that he did not realize that he was dragging the victim and that, because of language and cultural barriers, he did not understand what the people on the street were trying to communicate to him. He asserts that the Commonwealth failed to prove that he acted recklessly in that he knowingly ran the risk that his conduct would result in the victim's death.

Proof of wanton or reckless conduct requires "more than a mistake of judgment or even gross negligence." Commonwealth v. Michaud, 389 Mass. 491, 499 (1983). Wanton or reckless conduct is defined as "intentional conduct, . . . which conduct involves a high degree of likelihood that substantial harm will

result to another." Welansky, supra at 399. "What must be intended is the conduct, not the resulting harm." Id. at 398.

The Commonwealth may prove wanton or reckless conduct under a subjective standard, based on the defendant's specific knowledge, or an objective standard, based on what a reasonable person should have known under the circumstances. Commonwealth v. Pugh, 462 Mass. 482, 496 (2012). "If based on the subjective measure, i.e., the defendant's own knowledge, 'grave danger to others must have been apparent and the defendant must have chosen to run the risk rather than alter [his] conduct so as to avoid the act or omission which caused the harm.'" Id. at 497, quoting from Welansky, supra. "If based on the objective measure of recklessness, the defendant's actions constitute 'wanton or reckless conduct . . . if an ordinary normal [man] under the same circumstances would have realized the gravity of the danger.'" Id. at 496-497, quoting from Welansky, supra at 398–399.

Here, a rational trier of fact (in this case, the trial judge) could have found beyond a reasonable doubt that the defendant intentionally drove his truck in a wanton or reckless manner. To begin, the defendant chose to drive after he was visibly drunk and even his nine-year-old niece had warned him not to take his son with him. While evidence of the defendant's drunkenness standing alone may not have been sufficient to prove

wanton or reckless conduct where, as here, the separate element of impairment must also be proven, but see Commonwealth v. Scott, 359 Mass. 407, 410 (1971) (evidence sufficient "to warrant the jury to find that in driving his automobile while his mental and physical faculties were substantially impaired by the effect of intoxicating liquor, the defendant committed a wanton or reckless act"), the trier of fact may properly consider the defendant's decision to drive while drunk as a factor toward proof of recklessness. See Commonwealth v. Dyer, 77 Mass. App. Ct. 850, 857 n.9 (2010).

Furthermore, the defendant continued to drive his truck after he hit the victim, causing the victim and his motorcycle to roll over his hood and crash into the windshield. Even if the defendant did not actually apprehend the grave danger of continuing to drive, any ordinary person in his circumstances would have. Notwithstanding banging on the truck by the victim and witnesses, people yelling at him to stop, and the victim's screams, the defendant drove on. A rational trier of fact could have found that the defendant intentionally ignored a plethora of readily apparent warning signs. Even if the judge credited the defendant's claim that he did not understand what was happening, the judge could have convicted based solely on the determination that any reasonable person in the defendant's place would have realized the danger of continuing to drive.

The evidence was sufficient to convict the defendant of OUI manslaughter.

2.  <u>Admissibility of 911 call as excited utterance</u>.  The defendant filed a motion in limine to exclude from evidence the audio recording of the 911 call that his nine-year-old niece Vivian made to the police shortly after she saw him drive off with her six-year-old cousin as a passenger.  In connection with the motion, the parties submitted a transcript of Vivian's pretrial deposition.  Based on the deposition testimony, the judge concluded that Vivian's concern for her cousin's safety was sufficient "to constitute a level of excitement necessary" to admit the call under the spontaneous utterance exception to the hearsay rule.[3]

---

[3] A spontaneous utterance is admissible "if (1) there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer,' and (2) if the declarant's statement was 'a spontaneous reaction to the occurrence or event and not the result of reflective thought.'" <u>Commonwealth</u> v. <u>Santiago</u>, 437 Mass. 620, 623 (2002), quoting from 2 McCormick, Evidence § 272, at 204 (5th ed. 1999).  See Mass. G. Evid. § 803(2) (2016).  To determine whether a statement meets this test, a judge may consider "the degree of excitement displayed by the person making the statements, whether the statement is made at the place where the traumatic even occurred or at another place, the temporal closeness of the statement to the act it explains, and the degree of spontaneity [shown by the declarant]." <u>Commonwealth</u> v. <u>Joyner</u>, 55 Mass. App. Ct. 412, 415 (2002) (citations and quotations omitted).  "[T]he statements need not be strictly contemporaneous with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and be dissipated."

The dispatcher who received the call testified to authenticate the recording, which was then admitted and played for the judge.  The defendant renewed his objection.  Although after listening to the recording the judge stated that Vivian "seemed a little calmer than he expected," and that as the call went on "she was responding to questions and, therefore, reflecting on what she was saying, which is the antithesis of excited utterance," he concluded that "on balance" her motivation to make the call was her concern that her cousin was in peril, and he held the recording to be admissible.

The judge did not abuse his discretion in admitting the recording.  See Commonwealth v. Simon, 456 Mass. 280, 296 (2010).  Nine-year-old Vivian took the extraordinary step of calling 911 because she was concerned that her cousin was in danger.  Her initial statements -- which included the only part of the call admitted for its truth, the assertion that the defendant was drunk -- up to her asking "What can we do?," were made under the influence of the traumatizing event of watching her cousin drive away with her drunk uncle.  Even responses to a dispatcher's question may be admissible as spontaneous utterances.  See Ibid.  To the extent the influence of the traumatic event dissipated during the rest of Vivian's

Commonwealth v. McLaughlin, 364 Mass. 211, 223 (1973), quoting from Wigmore on Evidence § 1750 (3d ed. 1961).

conversation with the dispatcher and it no longer qualified as an excited utterance, it was not hearsay either, as none of Vivian's statements identifying the defendant and his vehicle made assertions that were used at trial for their truth.

Moreover, any error in admitting the call was not prejudicial.[4] The Commonwealth produced ample evidence, including Vivian's in-court testimony, that the defendant was drunk. The most devastating aspect of Vivian's call was not that she said the defendant was drunk, but that she was so worried about his driving in that condition that she felt the need to place the call. The content of the call had little, if any, effect on the verdict. See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

---

[4] The recording begins with Vivian telling the dispatcher that her stepfather was "drinking beer with his brother . . . in the car and his brother has a little kid in the car and drinking beers. . . . His brother is kind of drunk too, and his brother has a kid, a little kid, that's kind of like six or five years old." When asked, "What's the emergency?," Vivian said, "He's like drunk." When the dispatcher first began to question Vivian, she asked, "What can we do?" For the remainder of the call, the dispatcher asked questions aimed at identifying the vehicle and its occupants. Because Vivian testified at trial and the defendant had an opportunity to cross-examine her, the admission of the 911 call did not implicate constitutional confrontation clause concerns. See Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004); Commonwealth v. King, 445 Mass. 217, 236-237 (2005); Commonwealth v. Napolitano, 42 Mass. App. Ct. 549, 555 (1997). Because the defendant preserved his hearsay objection at trial, "[w]e evaluate whether the admission of this information, if classified as hearsay, could constitute prejudicial error." Commonwealth v. McLaughlin, 79 Mass. App. Ct. 670, 680 (2011).

3. <u>Translated transcript of stationhouse video</u>. The defendant also contends that the judge erred in admitting four pages of an English-language transcript of the video recording of the defendant's sobriety tests at the police station, conducted in Spanish, in which the defendant is reported to say, "I had about six beers."

Officer Arce, who conducted the sobriety tests and the booking procedure, testified about his questions, the defendant's answers, and how the defendant performed on each of the tests. Arce and the defendant were able to understand each other, albeit with some difficulty. The Commonwealth introduced the videotape of the interview in evidence with no objection, but when the Commonwealth sought to admit an English-language transcript of the conversation, the defendant objected, relying on the best evidence rule ("It's not the best evidence. The best evidence is the video"), and contending that Officer Arce was not qualified to verify the translation of the defendant's Spanish dialect. On appeal, he makes the slightly different argument that the Commonwealth was required to produce expert testimony from a qualified translator in order to introduce the transcript. We discern no error.

Contrary to the defendant's "best evidence" argument at trial, when the Commonwealth seeks to introduce a recorded statement in a language other than English, "the prosecutor may

not offer the recorded statement in evidence without an English-language transcript."  Commonwealth v. Portillo, 462 Mass. 324, 328 (2012) (Portillo).  "In these cases, the only evidence of the content of the recorded words is the English-language transcript, not the foreign language recording."  Ibid. (Emphasis in original).

Portillo set forth the procedure for the admission of English-language transcripts.  First, "the prosecutor must provide defense counsel an English-language transcript sufficiently in advance of trial to enable defense counsel to determine whether agreement can be reached regarding the transcript or whether a translator should be retained to prepare and defend a different English-language transcript."  Id. at 330.  If the parties are unable to agree on a translation, each may offer its own transcript "through the testimony of a translator who meets the criteria to be considered an expert in the foreign language."  Id. at 329.

The Commonwealth followed the Portillo protocol to the letter, providing defense counsel with the video recording and the transcript with its discovery materials on December 13, 2011.[5]  On May 15, 2013, defense counsel obtained funds for an

---

[5] By providing the defendant with its English-language transcript on December 13, 2011, the Commonwealth actually anticipated the rule announced in the Portillo decision, which

interpreter to assist with trial preparation. Thus, the defendant had ample time and opportunity to review and verify the translation, but he did not raise any objection until the moment the prosecutor offered it in evidence at trial. Even then, he did not make any argument that the translation was inaccurate or unreliable. The prosecutor provided the transcript to defense counsel well before offering it in evidence, as the Portillo protocol requires, "leaving sufficient time to resolve in advance of trial any questions regarding the accuracy of the translation." Id. at 332 (emphasis supplied). The defendant raised his objection far too late to contest the transcript's accuracy or to permit the Commonwealth to produce an expert to verify it. At this point in the trial, the judge did not err or abuse his discretion in allowing the only available translation in evidence.

4. Duplicative punishment. Finally, the defendant contends that his convictions of OUI manslaughter under G. L. c. 265, § 13½, and of felony motor vehicle homicide under G. L. c. 90, § 24G(a), violate the prohibition against "duplicative"

---

was issued on May 29, 2012. The trial in this case took place in May, 2014, almost two years after publication of Portillo.

convictions because felony motor vehicle homicide is a lesser-included offense of OUI manslaughter.[6]  We agree.

A defendant may be punished for two crimes arising out of the same conduct so long as each crime requires proof of an element that the other does not.  See Morey v. Commonwealth, 108 Mass. 433, 434 (1871); Commonwealth v. Vick, 454 Mass. 418, 431-432 (2009) (Vick); Commonwealth v. Flanagan, 76 Mass. App. Ct. 456, 462 (2010).  A lesser offense is considered duplicative of a greater offense if all of its elements are included within the greater offense.  Ibid.  But "[i]f the lesser crime requires proof of an additional fact that the greater crime does not, then it is not a lesser included offense of the greater crime."  Commonwealth v. Murray, 51 Mass. App. Ct. 57, 60 (2001).  "As long as each offense requires proof of an additional element that the other does not, "neither crime is a lesser-included offense of the other, and convictions on both are deemed to have been authorized by the Legislature and hence

---

[6] OUI manslaughter is punishable by a state prison term of up to twenty years, with a mandatory minimum term of five years. See G. L. c. 265, § 13½.  Felony motor vehicle homicide is punishable by a state prison term of up to fifteen years or a house of correction term of up to two and one half years.  See G. L. c. 90, § 24G(a).  The judge sentenced the defendant to a term of twelve to fourteen years on the manslaughter conviction and a concurrent term of nine to ten years on the motor vehicle homicide conviction.

not [duplicative].'"  Vick, supra at 431, quoting

from Commonwealth v. Jones, 382 Mass. 387, 393 (1981).

The defendant's conviction of OUI manslaughter required proof of the elements of involuntary manslaughter -- (1) that the defendant caused the victim's death, (2) that the defendant intended the conduct that caused the victim's death, and (3) that the defendant's conduct was wanton or reckless -- plus the elements of OUI -- (4) that the defendant operated a motor vehicle (5) on a public way (6) while under the influence of intoxicating liquor (or with a blood alcohol level of .08 or higher).  See G. L. c. 90, § 24(1)(a); Commonwealth v. Colturi, 448 Mass. 809, 817-818 (2007); Commonwealth v.  Filoma, 79 Mass. App. Ct. 16, 20 (2011).  Felony motor vehicle homicide requires proof that the defendant (1) on a public way (2) while operating a motor vehicle (3) under the influence of intoxicating liquor (or with a blood alcohol level of .08 or higher) (4) "operate[d] a motor vehicle recklessly or negligently so that the lives and safety of the public might be endangered" (5) causing the victim's death.  G. L. c. 90, § 24G(a).  See Commonwealth v. Diaz, 19 Mass. App. Ct. 29, 36-37 (1984) (Diaz); Commonwealth v. Williams, 73 Mass. App. Ct. 833, 837-838 (2009).  As to the element of operating recklessly or negligently, "[a] finding of ordinary negligence suffices to establish homicide by motor vehicle as defined in G. L. c. 90, § 24G."  Diaz, supra at 36.

See Commonwealth v. Labelle, 67 Mass. App. Ct. 698, 699 (2006) (Labelle), and cases cited. The felony motor vehicle homicide indictment in this case charged the defendant solely under a theory of negligent operation.

The two crimes share several elements: both include the three elements of OUI and the element of causing the victim's death. The single difference is that OUI manslaughter requires proof that the defendant intentionally engaged in wanton or reckless conduct, whereas felony motor vehicle homicide requires only negligence.[7] Recklessness is intentional conduct; therefore, to convict for involuntary manslaughter, or any other crime requiring wanton or reckless conduct, the Commonwealth must prove that the defendant intended the conduct -- though not necessarily the result. Welansky, 316 Mass. at 398. See Model Penal Code and Commentaries § 2.02 comment 3, at 236 (1985) ("recklessness involves conscious risk creation"). It is the consciousness of the risk that defines recklessness whether the defendant actually appreciates the danger he is causing or, given his knowledge, should have appreciated the danger. See Criminal Model Jury Instructions for Use in the District Court 5.260 [Operating Recklessly] (2009) (Model Instructions) ("A

---

[7] Had the Commonwealth proceeded on the felony motor vehicle homicide charge under a theory of reckless operation, its elements would have been identical to those of OUI manslaughter.

person drives recklessly when he ignores the fact that his manner of driving is very likely to result in death or serious injury to someone, or he is indifferent to whether someone is killed or seriously injured").

Negligence, on the other hand, lacks the element of intent. See Diaz, supra at 37 ("The essence of the offense of vehicular homicide is negligence, i.e., an unintended act"). Indeed, reckless operation is defined as going "beyond mere negligence." Model Jury Instructions 5.260 ("It is not enough for the Commonwealth to prove that the defendant acted negligently -- that is, acted in a way that a reasonably careful person would not. It must be shown that the defendant's actions went beyond mere negligence and amounted to recklessness"). See also Labelle, supra at 700 ("The instruction on reckless conduct conveyed to the jury that to convict on the basis of reckless operation, they were required to find a heightened level of fault substantially in excess of ordinary negligence").

Thus, the element of negligent operation in the crime of motor vehicle homicide is included within the element of reckless operation in the crime of OUI manslaughter. "A juror finding the defendant's operation of his motor vehicle to be reckless implicitly must also have found his operation to be negligent so as to endanger the lives or safety of the public." Id. at 699. In proving that the defendant

intentionally drove his truck in a wanton or reckless manner to sustain his conviction of OUI manslaughter, the Commonwealth necessarily proved that he operated the truck negligently.  As all of the elements of felony motor vehicle homicide are included within the elements of OUI manslaughter, it is a lesser-included offense and the defendant's convictions for both crimes are duplicative.  Accordingly, while we affirm the defendant's conviction and sentence for OUI manslaughter, the more serious offense, we must vacate the motor vehicle homicide conviction and sentence.  See Commonwealth v. Valliere, 437 Mass. 366, 371-372 (2002).

Conclusion.  The judgments on the indictments for OUI manslaughter, reckless endangerment of a child, leaving the scene of an accident causing death, failure to stop, and operating a motor vehicle without a license are affirmed.  The judgment of conviction of felony motor vehicle homicide is reversed as duplicative, the verdict is set aside, and the indictment is to be dismissed in the Superior Court.

So ordered.