NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-946                                        Appeals Court

COMMONWEALTH  vs.  ANTWOIN MOORE.

No. 15-P-946.

Plymouth.     February 16, 2017. - August 10, 2017.

Present:  Kafker, C.J., Wolohojian, & Sacks, JJ.

Motor Vehicle, Homicide.  Homicide.  Malice.  Practice,
    Criminal, Required finding, Argument by prosecutor,
    Instructions to jury, Assistance of counsel, Verdict.

Indictments found and returned in the Superior Court
Department on November 16, 2012.

The cases were tried before Frank M. Gaziano, J., and a
motion to reduce the verdict was considered by him.

Elizabeth Doherty for the defendant.
Laurie S. Yeshulas, Assistant District Attorney, for the
Commonwealth.

SACKS, J.  On October 12, 2012, at approximately 4:30 P.M.,

the defendant led police on a high-speed chase through the

streets of Brockton, finally running a red light at a busy

intersection and causing a seven-car collision resulting in the

death of another driver, Marianne Kotsiopoulos.  After a four-

day trial, a jury found the defendant guilty of murder in the second degree, involuntary manslaughter,[1] and numerous other crimes arising out of the collision.[2] He now appeals his murder conviction and the trial judge's denial of his postconviction motion to reduce the verdict pursuant to Mass.R.Crim.P. 25(b)(2), as amended, 420 Mass. 1502 (1995). The defendant argues that (1) the evidence was insufficient to support a finding of third prong malice; (2) the Commonwealth's closing argument was improper; (3) the judge erred in declining to instruct that manslaughter is a lesser included offense of murder; (4) counsel was ineffective in failing to request an "accident" instruction; and (5) the trial judge abused his discretion in declining to reduce the second degree murder verdict to a lesser offense. We affirm.

The Commonwealth's case. We recite the evidence and the reasonable inferences to be drawn from it in the light most

---

[1] As discussed infra, manslaughter was charged by separate indictment and sent to the jury for their consideration without an instruction that it is a lesser included offense of murder in the second degree. After the jury returned guilty verdicts on both charges, the trial judge vacated the manslaughter verdict, dismissed that indictment, and sentenced the defendant on the murder conviction.

[2] Motor vehicle homicide, leaving the scene of an accident causing personal injury resulting in death, leaving the scene of an accident causing property damage (six indictments), leaving the scene of an accident causing personal injury (six indictments), and operating a motor vehicle after license suspension or revocation. On appeal, the defendant makes no argument as to any of these convictions.

favorable to the Commonwealth.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  Detectives Donahue and Carpenter of the Brockton police department were conducting an investigation into narcotics activity in an unmarked sport utility vehicle (the SUV).  They observed a Chevrolet TrailBlazer sport utility vehicle, operated by the defendant, roll through a stop sign.  The detectives decided to stop the TrailBlazer; they passed it on the left, illuminated their emergency lights, and parked in front of it at a forty-five degree angle.  Detective Donahue, who was driving the SUV, walked around toward the driver's side of the TrailBlazer, and Detective Carpenter exited from the SUV's passenger side.  Detective Carpenter made eye contact with the defendant and shouted, "Stop, police, stop, police."  He watched the defendant "looking around quickly from left to right, almost in a panic sense," then saw him reach down for the gearshift.  The TrailBlazer "took off" abruptly, driving toward Detective Carpenter standing at the SUV's open passenger side door, squeezing between it and a telephone pole, driving over the sidewalk, and turning right onto Crescent Street.  The TrailBlazer's front bumper hit the passenger-side door of the SUV, forcing it shut as soon as Detective Carpenter was able to retract his foot inside.

Two more detectives had by then arrived.  As the TrailBlazer headed east down Crescent Street, traveling at a "high rate of speed going in and out of traffic," those detectives pursued, followed by the SUV and a third police vehicle.  The TrailBlazer weaved in and out of lanes heading both east and west, driving on the yellow center lines, while other vehicles stopped or pulled over to allow the police vehicles, with lights and sirens activated, to pass.  The TrailBlazer traveled on the wrong side of the road in making a left turn onto Quincy Street, "the rim . . . riding on the ground," tires squealing, and rear end sliding, and it continued north at high speed, gaining distance on the police.  Witnesses described traffic at the time as "heavy," "rush hour," "bumper to bumper," "gridlocked," "busy," and "very steady."

By then several hundred yards in front of the police vehicles, the TrailBlazer sped through a red light at the intersection of Quincy Street and Centre Street and collided with another vehicle.[3]  The TrailBlazer's rear end went "completely up in the air, vertical"; "if you were in the driver's seat of the vehicle, you'd almost be looking straight down at the ground through the windshield."  Another detective

_____

[3] The detective in the lead police vehicle testified that, "a split second" before the collision, he had decided that the police "were never going to catch" the defendant.  He therefore decided "to shut down the pursuit" and deactivated his lights and siren.

who had joined the pursuit testified that he saw a car "go airborne" at the intersection.  A witness described it as a "massive explosion of dust and metal [that] completely engulfed" the intersection.  The first point of impact was the driver's side of a Jaguar, driven by Marianne Kotsiopoulos, which bore the brunt of the collision.  The Jaguar and TrailBlazer further collided with at least five other vehicles, a scene one witness described as "like a pinball machine."

The TrailBlazer was equipped with an "Event Data Retrieval" (EDR) system, which recorded the vehicle's speed just prior to the collision.  The EDR data revealed that the TrailBlazer had accelerated at full throttle from fifty-three miles per hour five seconds before the impact, to sixty-four miles per hour one second before impact, and at the moment of impact was traveling approximately fifty-five miles per hour.  The EDR system also revealed that the brake pedal was never depressed prior to impact.

After the collision, the defendant exited the wrecked TrailBlazer, left the scene on foot, and was apprehended nearby. After receiving Miranda warnings, the defendant told Detective Donahue that he "didn't mean to hurt anybody," "hoped everybody was okay," and "basically took off from [the police] because he didn't have a license to drive."  In an interview a few hours later, the defendant told another officer that he had seen a

police car with lights in his rear view mirror but "didn't want to stop," because he didn't have a license, so he "just kept driving . . . because [his] brakes wouldn't stop for [him.]" He said that as he approached the intersection, there were cars on his side of the street, so he "went around them on the left side," into the intersection, and collided with another car.

The defendant's case. The defendant, who testified at trial, gave a version of events largely similar to the Commonwealth's. Although the jury were not required to credit the defendant's explanations, we supplement the facts with portions of his testimony that are relevant to his arguments on appeal.

On the day in question, the defendant planned to meet an acquaintance and conduct a drug transaction in the area where Detectives Donahue and Carpenter were patrolling. The defendant was looking for and attempting to contact his acquaintance when he approached a stop sign and noticed that a car had pulled up behind him "out of nowhere." The defendant perceived the car's movements as threatening and suspicious, thought someone was trying to "pin [him] in" and rob him, and "instinctively panicked," veering off to the right onto Crescent Street. The defendant could not recall how fast he was driving, but knew that he was passing other cars. He testified that he "felt really threatened" and thought his "life was in harm's way."

After traveling one-half mile down Crescent Street, turning left onto Quincy Street, and proceeding north, the defendant began to hear sirens behind him. He looked in his rearview mirror and saw blue lights in the distance. The defendant "didn't know how to react," so he "froze up," and by the time he looked forward again, he was already at the intersection with Centre Street and colliding with the other vehicles. He admitted that he did not apply the brakes, which he testified were "getting worn down" and not "pinpoint accurate."

The defendant also admitted that he was aware at the time that his driver's license had been suspended, but explained that the real reason he fled was out of fear that someone was trying to rob him, not to evade the police. The defendant insisted that he did not know it was the police who were pursuing him until he was nearly at the intersection where the collision occurred. The defendant acknowledged that he caused the collision and was responsible for Kotsiopoulos's death.

Trial proceedings. Prior to trial, a judge denied the defendant's motion to dismiss the indictment charging murder in the second degree. After the close of the Commonwealth's case, and again after the close of the evidence, the defendant's motion for a required finding of not guilty on that charge was also denied. These motions concerned the sufficiency of evidence as to third prong malice, which we discuss infra.

At the charge conference, the prosecutor, defense counsel, and the judge acknowledged that manslaughter is typically a lesser included offense of murder, and they discussed the possibility of so instructing the jury.  The judge declined to give that instruction, reasoning that both charges must go to the jury because they were charged by separate indictments.  The judge announced that, should the jury return guilty verdicts on both, he would vacate the conviction of manslaughter.  The defendant did not object, and the judge instructed the jury on both involuntary manslaughter and second degree murder as separate charges.

The jury returned guilty verdicts on both charges.  At sentencing, the judge declined to reconsider his denial of the defendant's motion for a required finding of not guilty.  He vacated the manslaughter conviction, and imposed a sentence of life in prison on the conviction of murder in the second degree.

Pursuant to Mass.R.Crim.P. 25(b)(2), the defendant moved to reduce the second degree murder verdict to a lesser offense.  The motion judge, who was also the trial judge, denied the motion without findings or an express statement of his rationale.  The defendant now appeals.

Discussion.  1.  Sufficiency of evidence of third prong malice.  "Murder in the second degree is an unlawful killing with malice."  Commonwealth v. Horne, 466 Mass. 440, 443 n.2

(2013).  Malice, in turn, may be established in any one of three ways, by proving that:

> "(1) the defendant intended to cause the victim's death; (2) the defendant intended to cause grievous bodily harm to the victim; or (3) the defendant committed an intentional act which, in the circumstances known to the defendant, a reasonable person would have understood created a plain and strong likelihood of death."

Commonwealth v. Earle, 458 Mass. 341, 346 (2010).[4]

The defendant claims that the Commonwealth failed to prove the third prong of malice, because the evidence was insufficient to show that he committed an act that a reasonable person, in the circumstances known to him, would have understood to create a "plain and strong likelihood of death."  He argues that the evidence could sustain only a verdict of involuntary manslaughter, which requires proof of "wanton or reckless conduct" involving a "high degree of likelihood that substantial harm will result to another."  Commonwealth v. Welansky, 316 Mass. 383, 397, 399 (1944).  In the defendant's view, no rational jury could find that he should have known his conduct created a plain and strong likelihood of death.

We disagree.  Viewed in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, the evidence showed that the defendant, driving an SUV, led

---

[4] Here, the Commonwealth proceeded solely on a third prong malice theory, although the jury were instructed on all three prongs.

police on a high-speed chase through busy city streets at rush hour, driving dangerously and erratically and committing serious traffic violations before running the red light at the intersection, causing an extraordinarily high-impact collision. By the defendant's own testimony, he did this while believing that his vehicle's brakes were not in good working order, further heightening the risk of harm he should have perceived at the time. Still, he made no effort to brake, slow down, or steer away from the intersection before the collision.

Regardless of the defendant's motive for fleeing, and of whether he knew that his pursuers were the police, the jury were entitled to find that a reasonable person in the defendant's circumstances would have perceived that his conduct went beyond mere recklessness and created a degree of risk more serious than simply a high likelihood of substantial harm to another. A rational jury could have concluded that the defendant should have been aware that his conduct created a plain and strong likelihood that someone -- be it a fellow motorist, pedestrian, or pursuing police officer -- would die. Thus, the evidence was sufficient to support a third prong theory of malice, and the judge did not err in denying the defendant's motion for a required finding of not guilty of murder in the second degree.

2. Prosecutor's closing argument. The defendant, for the first time on appeal, takes issue with the prosecutor's

statements during his closing argument that the defendant "aimed" or "pointed" his car directly at the intersection. He claims that the evidence showed that he was "just trying to get away" and was already colliding with other vehicles at the intersection before he realized it. He also argues that it was improper for the prosecutor to argue that the defendant "knew" his brakes were not functioning properly, where the evidence showed that although the defendant believed that to be the case, a postaccident forensic analysis showed that the brakes were actually not defective and in any event were not applied before the collision.

We think the statements, taken in context, fairly urged the jury to draw rational inferences from the evidence presented: that the defendant made no attempt to avoid the collision, and instead continued to steer and accelerate directly toward an intersection with a red light, despite his belief that the brakes were worn. See Commonwealth v. Villalobos, 89 Mass. App. Ct. 432, 441 (2016). Defense counsel's failure to object to these statements "is some indication that . . . the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." Commonwealth v. Toro, 395 Mass. 354, 360 (1985). Even were we to conclude that the statements fell outside the bounds of permissible argument, which we do not, they posed no substantial risk of a miscarriage of justice.

3.  Jury instruction on manslaughter as lesser included

offense.  The defendant argues that the judge erred in declining

to instruct the jury that manslaughter is a lesser included

offense of murder.  The judge determined that he should not do

so, but instead should instruct separately on each offense,

because the defendant had been separately indicted for each

offense.  Defense counsel stated, "That's what I thought," and

neither requested a lesser included offense instruction nor

objected to its not being given.[5]  On appeal, however, without

---

[5] The defendant suggests that the issue was preserved by an exchange during the charge conference, when the prosecutor expressed the view that "[i]t might make more sense to the jurors" if the judge instructed on involuntary manslaughter as a lesser included offense of murder rather than as a separate offense.  When the judge, citing the separate indictments, declined to do so, the prosecutor raised the possibility of dismissing the involuntary manslaughter indictment so that the charge could be sent to the jury as a lesser included offense. The judge responded that "it's kind of late in the game for dismissal," but said that if the jury returned guilty verdicts on both charges, he would vacate the involuntary manslaughter conviction.  The prosecutor never argued that it was error not to give a lesser included offense instruction, and thus, unlike the case on which the defendant relies, the defendant's claim of error was not preserved.  See Commonwealth v. Claudio, 418 Mass. 103, 111 n.6 (1994) (defendant's request for instruction, combined with prosecutor's postcharge claim of error in omitting such instruction, sufficed to preserve issue for defendant's appeal).  Nor did the prosecutor choose to press the point by asserting the Commonwealth's right to enter a nolle prosequi on the involuntary manslaughter indictment, see Mass.R.Crim.P. 16(a), 378 Mass. 885 (1979) -- which, if done with or perhaps even without the defendant's consent, would have removed any impediment to instructing on involuntary manslaughter as a lesser included offense.  See Mass.R.Crim.P. 16(b).  See also Commonwealth v. Pellegrini, 414 Mass. 402, 404-405 (1993)

citing any authority suggesting that a lesser included offense instruction was required in these circumstances, the defendant asserts that the jury, who returned guilty verdicts on both charges, might have chosen to convict on only the manslaughter charge had they known that it was a lesser included offense. The Commonwealth maintains that there was no error because the jury were correctly instructed on the elements of both crimes. We agree.

The jury are presumed to have followed the judge's instructions. See Commonwealth v. Gonzalez, 465 Mass. 672, 681 (2013). By returning a guilty verdict on the murder charge, they necessarily concluded that the evidence supported a conviction for that crime, and we have concluded above that that evidence was legally sufficient. That they also found the evidence sufficient to support the lesser included offense is of no consequence.[6] We discern neither error nor prejudice, let

---

(prosecutor has exclusive power to decide whether to prosecute a case).

[6] The defendant suggests that the jury may have been confused by the distinction between reckless conduct and third prong malice, see Commonwealth v. Chase, 433 Mass. 293, 302 (2001), and, without a lesser included offense instruction, might not have understood that they could return a guilty verdict on involuntary manslaughter as a less serious offense than murder in the second degree. But had the jury received a lesser included offense instruction, they would also have been required to be instructed of their "duty, if they conclude that the defendant is guilty, to return a verdict of guilty of the highest crime which has been proved beyond a reasonable doubt

alone a substantial risk of a miscarriage of justice, in the decision not to give a lesser included offense instruction.

4. Failure to request instruction on "accident." The defendant additionally contends that trial counsel was ineffective in failing to request an instruction on "accident," resulting in a substantial risk of a miscarriage of justice. We do not agree, as the evidence did not warrant any such instruction.

In the criminal context, the term "accident" is used in two senses. See Commonwealth v. Figueroa, 56 Mass. App. Ct. 641, 648-650 (2002). It is sometimes used as "a label for the unintended consequences of a defendant's act," id. at 648, and in that sense "is not exculpatory if the defendant's intent to bring about what the defendant claims were the unintended consequences of his or her act is not an element of the crime for which he or she is on trial." Id. at 648-649. That is the case here; intent to cause death is neither a part of third prong malice, see Earle, 458 Mass. at 346, nor an element of involuntary manslaughter. See Figueroa, 56 Mass. App. Ct. at 649 & n.8. Thus there was no legal basis for an instruction on "accident" in this sense.

---

against the defendant." Commonwealth v. Fernette, 398 Mass. 658, 670 (1986), quoting from Commonwealth v. Dickerson, 372 Mass. 783, 797 (1977).

"Accident" in its second, broader sense, "although presupposing an unintended result, focuses on the nature of the conduct that produced that result and not simply on the result itself." Id. at 650. Used in this sense, the term refers to "an unintentional event occurring through inadvertence, mistake, or negligence," rather than through "wanton or reckless conduct," and thus "is a defense to a charge of involuntary manslaughter." Ibid. But a defendant is entitled to an instruction on accident in this sense only if "the evidence at trial fairly raised the possibility that [the defendant caused the victim's death] unintentionally while engaged in conduct that was neither wanton nor reckless." Ibid. Here, as in Figueroa, see id. at 651, the defendant's conduct was patently reckless at a minimum; even viewed in the light most favorable to him, it cannot be characterized as mere "inadvertence, mistake or negligence." Id. at 650.[7] The defendant thus was not entitled to an accident instruction, and his trial counsel was

---

[7] In Figueroa, the defendant's joint venturer, see 56 Mass. App. Ct. at 642, holding a loaded revolver with no trigger safety, and with his finger on the trigger, threw a punch at the victim with the hand holding the gun; it discharged as the punch landed, inflicting a fatal bullet wound. See id. at 651. See also Commonwealth v. Filoma, 79 Mass. App. Ct. 16, 24 (2011) (defendant not entitled to accident instruction where evidence showed "extraordinarily wilful, wanton, or reckless conduct: the acceleration [of his vehicle] during the nighttime both backward and forward through a narrow street choked with milling pedestrians").

not ineffective in failing to request one. See Commonwealth v. Filoma, 79 Mass. App. Ct. 16, 24 (2011) (same).

5. Denial of rule 25(b)(2) motion. The defendant appeals from the denial of his motion to reduce the murder verdict to manslaughter, pursuant to Mass.R.Crim.P. 25(b)(2). He argues that the facts of his case are more similar to cases involving involuntary manslaughter than to those involving second degree murder, and thus a verdict of manslaughter would more closely comport with justice.

a. Standards for rule 25(b)(2) motions. A judge presented with a rule 25(b)(2) motion "has broad authority to reduce a jury's verdict, despite the presence of legally sufficient evidence to support it . . . 'where the weight of the evidence . . . points to a lesser crime.'" Commonwealth v. Grassie, 476 Mass. 202, 214 (2017), quoting from Commonwealth v. Rolon, 438 Mass. 808, 821 (2003). The purpose of providing this power to the courts is "to ensure that the result in every criminal case is consonant with justice." Commonwealth v. Woodward, 427 Mass. 659, 666 (1998). But the power is to be used "sparingly." See id. at 667. "[T]he judge is not to sit as a 'second jury.'" Commonwealth v. Chhim, 447 Mass. 370, 381 (2006), quoting from Commonwealth v. Keough, 385 Mass. 314, 321 (1982). "A most important consideration is whether the jury verdict is markedly inconsistent with verdicts returned in similar cases."

Commonwealth v. Gaulden, 383 Mass. 543, 556 (1981). "[T]o justify a reduction in the verdict, there must be some weakness in the critical evidence . . . or some weakness in the evidence coupled with trial error." Commonwealth v. Lyons, 444 Mass. 289, 292 (2005). A judge considering a motion under rule 25(b)(2) "may rely on essentially the same considerations as does [the Supreme Judicial Court] when deciding whether to reduce a verdict to a lesser degree of guilt pursuant to G. L. c. 278, § 33E." Commonwealth v. Reavis, 465 Mass. 875, 891 (2013). The judge's decision is reviewed for abuse of discretion. See Gaulden, 383 Mass. at 557; Grassie, 476 Mass. at 214. Thus we examine whether the judge made "a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

b. Application of rule 25(b)(2) standards to this case. Although the judge made no express findings, we assess his denial of the motion on the assumption that he considered all of the relevant factors.[8] As discussed above, we discern no error

_____

[8] The Supreme Judicial Court has recently stated that although written findings are not required, "a brief explanation of the judge's rationale for denying a motion under rule 25(b)(2) assists the understanding of the parties, the public, and the appellate courts of the judge's decision . . . especially in close or difficult cases." Grassie, 476 Mass. at

at trial, see Lyons, 444 Mass. at 292, and so we examine whether the judge could reasonably have determined that the verdict was not "markedly inconsistent with verdicts returned in similar cases," Gaulden, 383 Mass. at 556; and, relatedly, that there was no "weakness in the critical evidence" of third prong malice.  See Lyons, 444 Mass. at 292.  To do so, we have reviewed the cases in which motor vehicle collisions have led to murder charges, searching for any clear line between fact patterns that ordinarily lead only to an involuntary manslaughter conviction and those fact patterns that lead to a second degree murder conviction on a third prong malice theory.  Finding no such clear line, we conclude that the judge did not abuse his discretion in denying the defendant's rule 25(b)(2) motion.

The cases we view as most relevant for comparison purposes are Commonwealth v. Guaman, 90 Mass. App. Ct. 36 (2016), cited by the defendant,[9] and Commonwealth v. Wojcik, 43 Mass. App. Ct.

---

215 n.12.  Because the trial judge here now serves on the Supreme Judicial Court, this court has no means by which to return the case to him for an explanation of his rationale.  Contrast id. at 216-217.  We have adopted an approach similar to that used in Gaulden, 383 Mass. at 547 (where trial judge made no findings in denying motion to suppress, and had retired so that remand for findings was impracticable, Supreme Judicial Court "analyzed the record to see if the findings implicit in the judge's ruling [were] supported").

[9] Less helpful are the defendant's citations to Commonwealth v. Jones, 382 Mass. 387 (1981), Commonwealth v. Giontzis, 47

595 (1997), cited by the Commonwealth.[10]  In Guaman, an

intoxicated driver rolled through a stop sign, hit a

motorcyclist, and then continued to drive while dragging the

victim under the vehicle, as bystanders pounded on the vehicle

and yelled for the driver to stop.  The driver was found not

guilty of second degree murder (apparently argued on a third

prong malice theory[11]), see 90 Mass. App. Ct. at 37 n.1, but was

convicted of manslaughter while operating a motor vehicle under

the influence of intoxicating liquor, a crime that ordinarily

---

Mass. App. Ct. 450 (1999), and Commonwealth v. Filoma, 79 Mass.
App. Ct. 16 (2011) -- none of which involved a murder charge --
and Commonwealth v. Papadinis, 402 Mass. 73 (1988), where it is
not clear that the first degree murder instructions included an
instruction on third prong malice.

[10] The other murder cases the Commonwealth cites do not
illuminate the distinction between third prong malice and the
intent required for involuntary manslaughter.  For example, in
Commonwealth v. Russell, 439 Mass. 340, 348 (2003), the
defendant apparently held animus toward his victim; nor does it
appear that the jury convicted on a third prong malice theory.
See id. at 350 n.8.  (In a similar vein, see Commonwealth v.
Griffin, 19 Mass. App. Ct. 174, 188 [1985], cited by the
defendant.)  And although Commonwealth v. Cherubin, 35 Mass.
App. Ct. 919 (1993), upheld a conviction of second degree
murder, we later ordered a new trial due to an erroneous third
prong malice instruction.  Commonwealth v. Cherubin, 55 Mass.
App. Ct. 834, 840 (2002).

[11] The Guaman decision reflects no evidence of first- or
second prong malice, i.e., of the driver's intention to cause
death or grievous bodily harm.  See 90 Mass. App. Ct at 38-41.
See also Earle, 458 Mass. at 346 (explaining three prongs of
malice).  We have examined the record underlying our decision in
Guaman and have verified that the murder charge was argued on a
third prong malice theory.

requires proof of the same mens rea as involuntary manslaughter.[12]  See id. at 39-40.

In Wojcik, the defendant engaged in an insurance fraud scheme in which he deliberately caused a truck he had rented to accelerate into an intersection and collide with another moving vehicle, resulting in the death of its driver.  The defendant was convicted of second degree murder on a third prong malice theory.[13]  43 Mass. App. Ct. at 598-600 & n.6.  Notably, we not only determined that the evidence of third prong malice was sufficient, id. at 600, but also upheld the denial of the defendant's motion under rule 25(b)(2) to reduce the verdict to involuntary manslaughter.  Id. at 611-612.

Comparing the facts of Guaman with the quite different facts of Wojcik does not allow us to locate any precise point at which fact finders ordinarily view conduct behind the wheel as going beyond posing merely a high degree of likelihood of substantial harm and instead posing a plain and strong

---

[12] In Guaman, unlike here, the defendant was intoxicated, thus weakening the evidence of third prong malice.  See Commonwealth v. Sama, 411 Mass. 293, 298 (1991) (in third prong malice case, evidence of intoxication bears on defendant's ability to possess requisite knowledge of circumstances in which he acted).  The defendant in Guaman contended that as he continued to drive, he did not know that he was dragging the victim.  90 Mass. App. Ct. at 40.

[13] We refer here to the defendant Robert Wojcik, who was convicted on a third prong malice theory, see 43 Mass. App. Ct. at 597-598, not to his codefendant, Stephen Wojcik, who was convicted on a felony-murder theory.  See id. at 597.

likelihood of death.[14]  The judge here reasonably could have
viewed the conduct in this case as falling somewhere in between.
Thus we cannot say that there was such a "weakness in the
evidence" of third prong malice, see Lyons, 444 Mass. at 292, or
such a "marked[] inconsisten[cy] with verdicts returned in
similar cases," Gaulden, 383 Mass. at 556, that it was "outside
the range of reasonable alternatives," L.L., 470 Mass. at 185
n.27, for the judge to decline to reduce the verdict.

Judgments affirmed.

Order denying motion to
    reduce verdict affirmed.

---

[14] The defendant fares no better based on his suggested
analogy to firearms cases.  He likens his case to Commonwealth
v. Hawkins, 157 Mass. 551 (1893), in which the court said that
where a defendant had fired a pistol at night on a dimly lit and
apparently deserted street, and the bullet hit a person 216 feet
away, that defendant would have been guilty of manslaughter had
the victim died.  Id. at 551-553.  The defendant here contrasts
his case to murder cases in which a defendant's intentionally or
knowingly firing a gun in the direction of one or more persons
has been viewed as creating a plain and strong likelihood of
death.  See, e.g., Commonwealth v. Mack, 423 Mass. 288, 290
(1996); Commonwealth v. Jenks, 426 Mass. 582, 585-586 (1998);
Commonwealth v. Braley, 449 Mass. 316, 331-332 (2007).  The
defendant's conduct here, in driving his vehicle at high speed
through a red light into a crowded intersection, could
reasonably be viewed as far more similar to the conduct in the
latter cases than to the conduct in Hawkins.